## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Mr. Sloan Manning, | § § | |
|     Plaintiff, | § | Case No. _____ |
| v. | § § | |
| | § | COMPLAINT |
| U.S. Office of Personnel | § | |
| Management, | § | |
|     Defendant. | § § | |
| | § | |

## COMPLAINT OF MR. SLOAN MANNING

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*, the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.*, and Section 1557 of the Affordable Care Act, 42 U.S.C. §18116. It also brings constitutional counts alleging sex discrimination and disability discrimination in violation of the United States Constitution, including the Fifth Amendment, Fourteenth Amendment, Nineteenth Amendment, and the Twenty-eighth Amendment.

As set forth below, Plaintiff Mr. Manning alleges that Defendant the U.S. Office of Personnel Management subjected him to sex and

disability discrimination in violation constitutional equal protection and federal nondiscrimination statutes on the basis of his sex and disability.

## PARTIES

1. Plaintiff Mr. Sloan Manning is a former federal employee. During his employ at the United States Department of Treasury's Internal Revenue Bureau and through present Mr. Manning has resided in Atlanta, Georgia with his wife.

2. Defendant U.S. Office of Personnel Management (OPM) is a federal agency housed within the Executive Branch and headquartered in Washington, D.C. As pertinent to this suit, OPM operates as human resources for federal employees. One of OPM's responsibilities is to provide, review, and ensure that the fringe benefit health plans provided to federal employees abide by nondiscrimination requirements imposed by federal statute and the United States Constitution.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 USC § 1331 because it involves federal statutory and constitutional claims.

4. Venue is proper in the District Court for the District of Columbia pursuant to 28 USC § 1391(e). Defendant, a federal agency, is

headquartered and resides in this district and a substantial part of the

events or omissions giving rise to the claim occurred in Washington, D.C.

5. Mr. Manning timely filed a federal sector EEO complaint against

Defendant OPM which was marked OPM Case No. 2015024.

6. All conditions precedent to the filing of suit have been performed or have

occurred.

## FACTS

7. Mr. Manning is a male citizen of the United States.

8.   Mr. Manning is a man.

9.   Mr. Manning is Black.

10.   Mr. Manning is visually impaired and legally blind.

11.   Mr. Manning is a transsexual man.

12.   Mr. Manning has gender dysphoria.

13.   Mr. Manning holds a Bachelor of Science in Family, Youth and

Community Sciences, awarded to him by the University of Florida in

December 2008.

14.   Mr. Manning seeks to remedy illicit coverage denials he experienced.

Additionally, he aims to help OPM grasp that his entitlement to

covered services free from discrimination—a right guaranteed to all

federal employees—is not extinguished by the fact that he is a trans man with gender dysphoria.

### *OPM is Responsible for the FEHB Program*

15.    OPM directly contracts for, manages, and oversees provision of the Federal Employee Health Benefits program (FEHB), a cluster of fringe benefits offered to federal government employees.

16.    Many Americans pursue careers civil service with the federal government because of its reputation for providing quality, nondiscriminatory healthcare plans through the FEHB program for which OPM is solely responsible.

17.    The federal government manages one of the largest employer health benefits schemes in the nation, with close to 3,000,000 total employees and beneficiaries currently participating in FEHB plans.

18.    The FEHB program also provides health benefits coverage to nearly all civilian federal employee retirees.

19.    Presently, OPM estimates that the FEHB program provides benefits to an estimated 8,300,000 persons.

20.    OPM contracts with private health insurers, of which Aetna is one example, who operate as third-party administrators of FEHB plans.

21.    OPM ostensibly operates as human resources for the federal government. In this capacity, OPM is responsible for ensuring that the third-party administrators it employs to manage FEHB plans comply with constitutional and statutory law that governs the provision and management of health benefits offered to federal employees, retirees, and their respective beneficiaries.

*Gender Dysphoria and Treatment*

22.    Gender dysphoria, also sometimes termed transsexualism, is a medical diagnosis applicable to persons who have a deep, persistent and consistent, understanding of their sex assigned at birth not matching their internal sense of sex.

23.    Persons with gender dysphoria are often termed trans, transgender, or transsexual. These terms are for the most part synonymous.

24.    The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders Version 5 (DSM-V) recognizes gender dysphoria as a medical condition. Gender dysphoria is defined by the DSM-V as a "marked incongruence between [the patient's] experienced or expressed gender and the one they were assigned at

birth" and "is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning."

25. Scientific studies have shown that trans persons have brain structures that are typical of nontrans persons with the same gender identity.

26. Because gender dysphoria is biologically based, efforts to change a person's gender identity are both unethical and futile.

27. Gender dysphoric individuals undergo a medically indicated sex transition in order to ameliorate the debilitation of the condition and live life consistent with their gender identity.

28. The World Professional Association for Transgender Health (WPATH) is an international association of medical professionals who treat gender dysphoria. Since its founding in 1979, WPATH has been broadly recognized as the leading authority on treatment best practices for gender dysphoria in the United States.

29. Every few years, WPATH promulgates a peer review publication titled the WPATH Standards of Care, which recommends an

individualized approach to treatment of gender dysphoria, consisting of one or more of the following protocol components of evidence-based care:

    a. Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

    b. Hormone therapy to feminize or masculinize the body;

    c. Surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring).

30.   Without treatment, gender dysphoric adults experience a range of debilitating psychological symptoms such as anxiety, depression, suicidality, and other attendant mental health issues. They are frequently socially isolated, as they carry a burden of shame and low self-esteem, attributable to the feeling of being inherently "defective." This leads to stigmatization, and over time proves ravaging to healthy personality development and interpersonal relationships.

31.   Without treatment, many gender dysphoric people are unable to adequately function in occupational, social or other areas of life.

32.   A key component of medical treatment for gender dysphoric individuals is to live in sex role and be regarded by others consistent with their internal sense of sex (sometimes termed *gender identity*). If any aspect of this social role transition is impeded, it will undermine an individual's core identity and psychological health.

33.   The failure to treat a man with gender dysphoria as a man intensifies the dysphoria, undermines medical treatment, increases emotional distress and can precipitate psychiatric disorders.

34.   For individuals with severe gender dysphoria, hormone therapy alone is insufficient. In these cases, dysphoria does not abate without surgical intervention.

35.   Hormone treatment has no effect on breast size, therefore, the most important surgical procedure for transgender men is chest reconstruction surgery. This procedure allows an individual to live safely and comfortably in the affirmed male role and normalizes life.

36.   Decades of methodologically sound and rigorous medical research have demonstrated that gender confirmation surgery is a safe and effective treatment for severe Gender Dysphoria and, indeed, for many, it is the only effective treatment.

37.     The American Medical Association, the American Psychiatric Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American Urological Association, and WPATH have all publicly endorsed the efficacy of medical therapies, including hormone treatments, for transgender persons.

38.     The American Medical Association, the American Psychiatric Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American Urological Association, and WPATH all recognize that medical therapies, including hormone treatments, are a form of medically necessary care for transgender persons.

39.     The American Medical Association, the American Psychiatric Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American Urological Association, and WPATH have all publicly called for both private and public insurers to eliminate transgender-specific exclusions in health insurance

plans.

*Mr. Manning's Tenure as a Federal Employee*

40.   Mr. Manning worked for the Internal Revenue Service, a division of the United States Department of Treasury from 2010 through January 2021.

41.   Mr. Manning joined the IRS through a special program which provides persons with visual impairments special training and placement in federal agencies.

## Mr. Manning's Medical Transition

42.   In 2012, Mr. Manning decided to legally, medically, and socially transition from female to male. Around this same time Mr. Manning was diagnosed with gender dysphoria.

43.   In January 2014, Mr. Manning started exogenous testosterone therapy under the supervision and care of the Emory Clinic for Endocrinology.

44.   Mr. Manning continues to take testosterone to this very day.

45.   After Mr. Manning started testosterone therapy, he sought a referral for male chest reconstruction.

46.    In late 2014, Mr. Manning identified Dr. Daniel Medalie, M.D. of Cleveland Plastic Surgery, based in Cleveland, Ohio, as his chosen surgeon. Dr. Medalie is a board-certified plastic and reconstructive surgeon. He obtained his bachelors magna cum laude from Harvard University and his medical doctorate from Cornell University.

47.    The surgery Mr. Manning sought, male chest reconstruction, consists of a bilateral mastectomy and nipple areola reconstruction. The overarching therapeutic goal of male chest reconstruction is to afford the patient a male-typical chest.

48.    The procedure Mr. Manning sought is the same precise treatment provided to nontrans boys and men diagnosed with gynecomastia. That same procedure is one of the most common male reconstructive surgeries performed in the United States today.

**Mr. Manning's FEHB Plan Administrator Aetna Denies Coverage**

49.    In early January 2015, Dr. Medalie's office submitted a pre-authorization request to Aetna, the third-party administrator of Mr. Manning's FEHB plan. In support of this request Dr. Medalie enclosed copies of letters of medical necessity attesting to Mr. Manning's

medical need. Dr. Medalie's request specifically included ICD codes for bilateral mastectomy and nipple-areola reconstruction.

50.    On January 30, 2015, Aetna notified Dr. Medalie and Mr. Manning via letter that it had approved the request for bilateral mastectomy, but declined coverage for nipple-areola reconstruction deeming the former but not the latter to be medically necessary for trans men.

51.    On or about April 9, 2015, the undersigned submitted a timely internal appeal to Aetna challenging denial of nipple-areola reconstruction.

52.    Mr. Manning's appeal pointed out that Aetna's denial was, by its own admissions, premised Mr. Manning's sex and/or disability. This was evidenced by what were then active coverage bulletins cited by Aetna which reflect that nipple-areola reconstruction was categorically deemed not medically necessary when sought by trans men to treat gender dysphoria, but not any other beneficiary. It also pointed to another Aetna bulletin which evidenced that where double mastectomy was sought by a nontrans woman, Aetna categorically considered nipple-areola reconstruction to be medically necessary.

53.  Mr. Manning's surgeon, Dr. Medalie, submitted a letter dated March 5, 2015, in support of his appeal. In pertinent part, that letter states: "I am writing you regarding the denial of nipple reconstruction. This denial makes no sense because if mastectomies are performed, then the nipples are removed. The nipples then need to be rec-contoured and replaced as grafts. It is not normal to have no nipples. They are a normal part of a person's anatomy and need to be restored."

54.  Peer review medical literature points out that American health insurers, like Aetna, provide inconsistent coverage for male and female chest reconstruction surgery where sought by trans persons. *See, e.g.*, Gaines Blasdel et al., *Limited Coverage of Gender-Affiming Breask Insurance CPT Coding Criteria*, 146 Plastic and Reconstructive Surgery 238e (Aug. 2020) ("The exclusion of specific CPT codes, frequently without clinical rationale, is medically unsupported. In addition, this practice is discriminatory, conflicts with established legal precedent, and may discourage surgeons from performing medically necessary procedures and significantly delay care . . . . Lack of consistent, clinically sound insurance coverage for medically necessary gender-affirming procedures limits the quality of

surgical care provided to transgender patients, who already face considerable health disparities. Lack of coverage forces patients and surgeons to delay care or creates significant burdens to patients.")

55.    On or about May 11, 2015, Aetna summarily denied Mr. Manning's first-level internal appeal reaffirming its initial decision that nipple-areola reconstruction is not medically necessary for trans men.

56.    Because Mr. Manning was advised by his surgeon that if he did not undergo bilateral mastectomy and nipple-areola reconstruction simultaneously he would have to forego having nipples for the rest of his life, Mr. Manning and his wife decided to pay for the procedure out of pocket.

57.    On May 15, 2015, Mr. Manning underwent male chest reconstruction surgery in Cleveland, Ohio. Dr. Medalie performed both bilateral mastectomy as well as nipple-areola reconstruction on Mr. Manning.

58.    Mr. Manning and his wife bore the whole cost of the nipple-areola procedure, for which he was charged and actually paid approximately $1,375 out of pocket.

*Mr. Manning Complains to OPM*

59.    On or about May 11, 2015, Mr. Manning filed a pre-complaint with
OPM, as required by federal law.

60.    On or about May 26, 2015, just eleven days after Mr. Manning
underwent surgery, an OPM investigator interviewed Mr. Manning
via phone with his counsel to take down his complaint. OPM issued a
Notice of Final Interview and Right to File a Formal Complaint that
same day.

61.    On or about June 12, 2015, Mr. Manning submitted paperwork in
support of his formal complaint. At that time, Mr. Manning notified
OPM that he believed Aetna's decision to deny him nipple-areola
reconstruction was made on account of his sex and or disability.

62.    On January 11, 2016, OPM notified Mr. Manning that it was
dismissing his complaint for failure to state a claim. In pertinent part,
the Final Agency Decision letter indicated that Mr. Manning "is not
aggrieved because he has not shown that the Agency caused him to
suffer a harm or loss with respect to a term, condition, or privilege of
employment for which there is a remedy."

**Mr. Manning Appeals OPM's FAD to the EEOC (First Appeal)**

63.    On February 17, 2016, Mr. Manning filed a timely notice of appeal to the U.S. Equal Employment and Equal Opportunity Commission (EEOC).

64.    On March 17, 2016, Mr. Manning filed a merits brief in support of his appeal to the Commission. In that brief, Mr. Manning argued that OPM was responsible for Aetna's failure to abide by federal law which forbids discrimination on the account of sex and disability in fringe benefits plans.

65.    On May 4, 2016, OPM filed a merits response brief alleging among other things that it was (a) not responsible for Aetna's management of FEHB plans and (b) federal law does not prohibit discrimination against trans persons on account of either sex or disability.

66.    On March 6, 2017, the EEOC issued a merits decision in Mr. Manning's appeal (Appeal No. 0120161068, Agency No. 2015024). The Commission held as a matter of federal law that trans employees like Mr. Manning have a right to equal coverage of health conditions and that trans specific exclusions violate Title VII and potentially also violate federal disability discrimination laws.

67.    The EEOC's order directed OPM to submit a compliance report to the EEOC within 30 calendar days. No such report was ever filed by OPM

## OPM Refuses to Abide by EEOC Order

68.    From April 2017 through April 2021, Mr. Manning repeatedly asked that OPM comply with the EEOC's March 2017 order.

69.    OPM has steadfastly refused since 2017 to admit it is bound by the EEOC's March 2017 order.

70.    Mr. Manning's counsel traveled in person to Washington, DC, made phone calls with OPM's legal counsel, and has exchanged dozens of emails since 2017 all in an effort to resolve this case.

71.    On the pretense that OPM required additional legal and medical authorities proving Mr. Manning is entitled to the relief granted him by the March 2015 EEOC order, he retained an expert witness, Dr. Randi Ettner, and submitted a twenty-nine page single spaced letter brief to OPM in June 2019.

72.    From late 2019 onward, OPM's counsel refused to respond or take calls from Mr. Manning's counsel.

73.    From late 2019 onward, OPM's counsel mistakenly emailed Mr. Manning's counsel about other cases, evidencing that OPM was capable of drafting and responding to email communications.

74.    On June 26, 2020, Mr. Manning's counsel sent a letter to OPM advising that he had requested a final agency determination 346 days prior and OPM had yet to respond to that request.

**Mr. Manning Appeals OPM's Refusal to Abide by EEOC Order (Second Appeal)**

75.    On April 23, 2021, Mr. Manning filed a notice of appeal to the EEOC seeking enforcement of the Commission's March 2017 order against OPM.

76.    On May 21, 2021, Mr. Manning filed a merits brief in support of his appeal.

77.    To date, OPM has yet to file a brief in response to Mr. Manning's appeal. OPM has yet to explain to the EEOC or Mr. Manning why it refused to respond to his appeal.

78.    On June 18, 2021, an amicus brief in support of Mr. Manning's second EEOC appeal was submitted by the National Center for Lesbian Rights, the National Center for Transgender Equality, and

the National LGBT Task Force in cooperation with the Quinnipiac University School of Law Legal Clinic.

79.    Mr. Manning has repeatedly requested that the EEOC issue a merits opinion on his appeal since 2021. Those requests have been made in writing and docketed in the administrative appeal system.

80.    For example, in a request dated March 28, 2024, Mr. Manning pleaded with the Commission to adjudicate his case, sharing that "It saddens me that after 9 years I still have not been granted the closure on this dark chapter of my life. This ordeal has hurt not just me but my wife. The toll of living for so many years as a second-class worker and citizen has been very difficult. I have, among other things, sought mental health support to deal with the trauma of being treated as if my medical needs do not matter simply because I am transgender."

81.    As another example, in a request dated July 12, 2024, asked the EEOC to "render a decision on his merits case so that he might, at last, have closure."

82.    On September 5, 2024, OPM reached out to Mr. Manning's counsel via email on the pretense that OPM "would like to discuss the potential of a settlement agreement" and directed the undersigned to

work with OPM attorney Katherine Brewer. That same day the undersigned emailed Ms. Brewer asking if OPM had settlement terms to propose.

83.  On September 11, 2024, Mr. Brewer asked the undersigned to send a formal demand letter to OPM.

84.  On September 20, 2024, the undersigned transmitted a formal demand letter. In addition to money damages, attorneys' fees, and costs, Mr. Manning demanded that OPM issue him a formal apology.

85.  On October 24, 2024, Ms. Brewer responded via email indicating that she lost Mr. Manning's demand letter. That same day, the letter was retransmitted to Ms. Brewer via email. That same day Ms. Brewer asked if Mr. Manning would agree to participate in a mediation. That same day, the undersigned indicated that Mr. Manning would agree to mediation but he was worried that without any olive branch demonstrating good faith efforts to resolve the matter mediation would be pointless. Ms. Brewer never responded to that email.

86.  Efforts to contact Ms. Brewer's supervisor, Charles M. Nimmons, have also gone unanswered.

87. Despite OPM's repeated demands that Mr. Manning calculate the damages, costs, and attorneys' due to him from 2015 to present, OPM has never extended a settlement offer to Mr. Manning.

## COUNT ONE

Sex Discrimination
in Violation of Title VII of the Civil Rights Act of 1964 and
Section 1557 of the Affordable Care Act

88. Plaintiff re-alleges each and every allegation contained in paragraphs 1–87.

89. Title VII of the Civil Rights Act of 1964 prohibits discrimination "because of . . . sex."

90. In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that discrimination on account of "transgender status" is sex discrimination in violation of Title VII.

91. In 2014 and 2015, OPM contracted with third-party health plan administrators, including Aetna, to provide fringe health benefits to federal employees. During this period, OPM was aware that some of the third-parties it contracted with had trans exclusions (partial and full) as terms of FEHB plans.

92.    Since at least 2015, OPM has dubiously insisted that it bears no responsibility for the discriminatory conduct of the third-party administrators, like Aetna, whom it contracted with to provide FEHB plans.

93.    Evidence reflects that under that same plan, Aetna considers nipple areola reconstruction to be per se medically necessary when sought by a nontrans women seeking bilateral mastectomy or a nontrans man seeking the same procedure to treat gynecomastia.

94.    Defendant OPM discriminated against Mr. Manning because of his sex by denying him fringe benefits without a trans healthcare exclusion. But for Mr. Manning being a trans man, the FEHB plan provided to him by OPM would not have denied his request for coverage of nipple-areola reconstruction made in conjunction with a request for bilateral mastectomy.

95.    Defendant OPM also discriminated against Mr. Manning by refusing to abide by a binding EEOC decision ordering it to comply with federal nondiscrimination law and remedy Mr. Manning's denial of coverage.

96.    Defendant OPM's willful refusal to follow the EEOC's March 2017 order, its refusal to participate in Mr. Manning's June 2021 appeal seeking enforcement of that order, are actions so severe and pervasive as to constitute hostilities on account of sex.

97.    Defendant OPM's acts and omissions violate Title VII of the Civil Rights Act of 1964 as well as Section 1557 of the Affordable Care Act, both of which prohibit discrimination on account of sex in employer provided health plans.

98.    As a direct and legal result of Defendant OPM's actions and omissions, Mr. Manning has suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; and other pecuniary losses not yet ascertained.


## COUNT TWO

Sex Discrimination
in Violation of the United States Constitution

99.    Plaintiff re-alleges each and every allegation contained in paragraphs 1–98.

100. The Equal Protection Clause of the Fourteenth Amendment guarantees all persons equal protection before the law. This right is reverse incorporated against the federal government by the Fifth Amendment.

101. There is no trans exclusion to constitutional equal protection.

102. The scope of equal protection was further extended by the Nineteenth Amendment, which gives women the right to vote and other civil rights, as well as the Twenty-eighth Amendment, colloquially known as the Equal Rights Amendment, which states in Section 1 that "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."

103. As required by Article V of the United States Constitution, the Twenty-eighth Amendment was ratified by the United States Congress in 1972. Thereafter, the Amendment was transmitted to the states for ratification.

104. On January 27, 2020, Virginia became the thirty-eighth state to ratify the Twenty-eighth amendment, in total satisfaction of Article V's requirement that 2/3 of states ratify an amendment.

105. As per Section 3 of the Twenty-eighth Amendment, "This amendment shall take effect two years after the date of ratification."

106. It has been more than four years since Virginia ratified the Twenty-Eighth Amendment, it is thus now in effect.

107. Some commentators have suggested that the Twenty-eighth Amendment is not ratified, citing non-amendment text suggesting that an exploding deadline for ratification was imposed by Congress.

108. However, neither Article I nor Article V of the United States Constitution expressly give Congress the power to clawback an amendment after Congress has ratified it.

109. In 2014 and 2015, OPM contracted with third-party health plan administrators, including Aetna, to provide fringe health benefits to federal employees. During this period, OPM was aware that some of the third-parties it contracted with had trans exclusions (partial and full) as terms of FEHB plans.

110. Since at least 2015, OPM has dubiously insisted that it bears no responsibility for the discriminatory conduct of the third-party administrators, like Aetna, whom it contracted with to provide FEHB plans.

111.   Evidence reflects that under that same plan, Aetna considers nipple areola reconstruction to be per se medically necessary when sought by a nontrans women seeking bilateral mastectomy or a nontrans man seeking the same procedure to treat gynecomastia.

112.   Defendant OPM discriminated against Mr. Manning because of his sex by denying him fringe benefits without a trans healthcare exclusion. But for Mr. Manning being a trans man, the FEHB plan provided to him by OPM would not have denied his request for coverage of nipple-areola reconstruction made in conjunction with a request for bilateral mastectomy.

113.   Defendant OPM also discriminated against Mr. Manning by refusing to abide by a binding EEOC decision ordering it to comply with federal nondiscrimination law and remedy Mr. Manning's denial of coverage.

114.   Defendant OPM's willful refusal to follow the EEOC's March 2017 order, its refusal to participate in Mr. Manning's June 2021 appeal seeking enforcement of that order, are actions so severe and pervasive as to constitute hostilities on account of sex.

## COUNT THREE

Disability Discrimination
in Violation of the Rehabilitation Act of 1973,
the Americans with Disabilities Act of 1991, and
Section 1557 of the Affordable Care Act

115. Plaintiff re-alleges each and every allegation contained in paragraphs 1–111.

116. Mr. Manning's 2015 FEHB plan, administered by Aetna, denied coverage of nipple areola reconstruction on the pretense that the procedure is not medically necessary when sought as treatment for gender dysphoria, a disability that manifests as a physical impairment.

117. Evidence reflects that under that same plan, Aetna considers nipple areola reconstruction to be per se medically necessary when sought by nontrans women and nontrans men seeking bilateral mastectomy for a condition other than gender dysphoria.

118. Based on his diagnosis of gender dysphoria, Mr. Manning is a member of the class of persons protected by the Rehabilitation Act, the Americans with Disabilities Act, and Section 1557 of the Affordable

Care Act which makes it unlawful for public entities to discriminate against an individual with a disability, or to deny the benefits of the services, programs, or activities of a public entity to a person with a disability.

119. In 2014 and 2015, OPM contracted with third-party health plan administrators, including Aetna, to provide fringe health benefits to federal employees. During this period, OPM was aware that some of the third-parties it contracted with had trans exclusions (partial and full) as terms of FEHB plans.

120. Since at least 2015, OPM has dubiously insisted that it bears no responsibility for the discriminatory conduct of the third-party administrators, like Aetna, whom it contracted with to provide FEHB plans.

121. Evidence reflects that under that same plan, Aetna considers nipple areola reconstruction to be per se medically necessary when sought by a nontrans women seeking bilateral mastectomy or a nontrans man seeking the same procedure to treat gynecomastia.

122. Defendant OPM discriminated against Mr. Manning because of his disability by denying him fringe benefits without a trans healthcare

exclusion. But for Mr. Manning being seeking treatment on account of his gender dysphoria diagnosis/ disability, the FEHB plan provided to him by OPM would have covered his request for nipple-areola reconstruction made in conjunction with a request for bilateral mastectomy.

123.   Defendant OPM's acts and omissions violate the Rehabilitation Act, the Americans with Disabilities Act, and Section 1557 of the Affordable Care Act all of which prohibit discrimination on the basis of physical and mental disability, and protects persons such as Mr. Manning from the type of injuries and damages set forth herein.

124.   Defendant OPM discriminated against Mr. Manning because of his disability by denying him fringe benefits without a trans healthcare exclusion. But for Mr. Manning's gender dysphoria diagnosis, the FEHB plan provided to him by OPM would not have denied his request for coverage of nipple-areola reconstruction made in conjunction with a request for bilateral mastectomy.

125.   Defendant OPM also discriminated against Mr. Manning by refusing to abide by a binding EEOC decision ordering it to comply

with federal nondiscrimination law and remedy Mr. Manning's denial of coverage.

126.  As a direct and legal result of Defendant OPM's and Aetna's actions and omissions, Mr. Manning has suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; and other pecuniary losses not yet ascertained.

## COUNT FOUR

Disability Discrimination
in Violation of the United States Constitution

127. Plaintiff re-alleges each and every allegation contained in paragraphs 1–120.

128. The Equal Protection Clause of the Fourteenth Amendment guarantees all persons equal protection of the law. This right is reverse incorporated against the federal government by the Fifth Amendment.

129. There is no gender dysphoria exclusion to constitutional equal protection.

130. For equal protection purposes, Mr. Manning's gender dysphoria diagnosis qualifies him as a person with a disability.

131. In 2014 and 2015, OPM contracted with third-party health plan administrators, including Aetna, to provide fringe health benefits to federal employees. During this period, OPM was aware that some of the third-parties it contracted with had trans exclusions (partial and full) as terms of FEHB plans.

132. Since at least 2015, OPM has dubiously insisted that it bears no responsibility for the discriminatory conduct of the third-party administrators, like Aetna, whom it contracted with to provide FEHB plans.

133. Evidence reflects that under that same plan, Aetna considers nipple areola reconstruction to be per se medically necessary when sought by a nontrans women seeking bilateral mastectomy or a nontrans man seeking the same procedure to treat gynecomastia.

134. Defendant OPM discriminated against Mr. Manning because of his disability by denying him fringe benefits without a trans healthcare exclusion. But for Mr. Manning being seeking treatment on account of his gender dysphoria diagnosis/ disability, the FEHB plan provided to

him by OPM would have covered his request for nipple-areola reconstruction made in conjunction with a request for bilateral mastectomy.

135. Defendant OPM also discriminated against Mr. Manning by refusing to abide by a binding EEOC decision ordering it to comply with federal nondiscrimination law and remedy Mr. Manning's denial of coverage.

136. As a direct and legal result of Defendant OPM's actions and omissions, Mr. Manning has suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; and other pecuniary losses not yet ascertained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A. Order Defendant to institute and carry out new policies, practices, and programs to prevent unlawful sex and disability discrimination;

B. Order Defendant to institute and carry out polices, practices, and programs to report, investigate, and effectively redress complaints about unlawful sex and disability discrimination;

C. Order Defendant to train their employees on constitutional and federal statutory prohibitions against unlawful sex and disability discrimination;

D. Order Defendant to compensate Mr. Manning with monetary relief for the damages he suffered including, but not limited to, loss of fringe benefits, humiliation, and loss of enjoyment of life.

E. Order any further relief necessary to make Mr. Manning whole;

F. Award such additional relief as justice may require, together with Plaintiff's costs, disbursements, and attorneys' fees in this action and the underlying agency actions.

Dated: February 5, 2025

Respectfully submitted,

/s/ Ezra Young
Ezra Young (NY Bar No. 5283114)
LAW OFFICE OF EZRA YOUNG
210 North Sunset Drive
Ithaca, NY 14850
P: (949) 291-3185
ezra@ezrayoung.com

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on February 5, 2025, I electronically filed the foregoing Status Report with the Clerk of Court for the United States District Court for the District of Columbia by using the CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

<u>/s/ Ezra Young</u>

Ezra Ishmael Young